# CASES DETERMINED

BY THE

# SUPREME COURT

OF THE

## STATE OF MISSOURI

AT THE

## OCTOBER TERM, 1900.

---

## THE STATE v. McGINNIS, Appellant.

### Division Two; November 12, 1900.

1. **Juror:** CHALLENGE: SPECIFIC OBJECTION. Unless the challenge of a juror for cause be specifically stated, the objection is not sufficient to authorize a review in the appellate court.

2. **Witness:** INTERPRETER. Courts are invested with discretion in appointing interpreters and translators of the testimony of witnesses who can not speak the English language, and unless there has been some abuse of this discretionary power the appointment will not be error.

3. ———: EXCLUSION OF IRRELEVANT MATTERS. A witness in describing a revolver with which defendant was charged to have murdered deceased, stated that defendant had robbed a store about ten or twelve days previously to the killing, and when witness came upon him defendant shot at him with the pistol. This irrelevant matter was not in response to the prosecuting attorney's question, was immediately excluded by the court, and in the instructions the jury were told not to consider any testimony which had been excluded. *Held,* that the verdict can not be reversed because this witness, either inadvertently or perversely, injected this incompetent evidence into the trial.

(105)

State v. McGinnis.

4. **Murder: ROBBERY: ISSUES: INSTRUCTION.** It is proper in a trial under an indictment which only charges murder, to instruct the jury that, if the homicide was committed in an attempt to commit robbery, the defendant was guilty of murder in the first degree. It is also proper that such instruction clearly defines robbery. And it is not error to give such instruction because the indictment tendered no such issue as robbery.

5. ————: **ALIBI: INSTRUCTION.** The instruction said that the defense of alibi was "as proper and legitimate, if proved, as any other." *Held,* that the words "if proved" were unfortunate, and open to criticism and had no place in the instruction, but are not sufficient to work a reversal since when the entire instruction is considered it is found to clearly inform the jury that if, in view of all the evidence, they had a reasonable doubt of the presence of the defendant at the time and place of the crime they should acquit him, and that it was a sufficient reason to acquit him if the evidence raised a reasonable doubt as to his presence there.

6. **Failure to Instruct.** Where no instruction has been asked on a given point, and no exception taken to the failure of the court to instruct upon all questions of law arising in the case, the point is not for review.

7. **Verdict: PASSION OR PREJUDICE.** Where the testimony, which is set out in this case, is sufficient, if believed by the jury, to support a verdict, and it has received the approval of the trial court, the appellate court will not interfere on the theory that it is based upon passion or prejudice.

Appeal from Bates Circuit Court.—*Hon. W. W. Graves,* Judge.

AFFIRMED.

*Silvers & Silvers* for appellant.

(1) The court erred in holding that John B. Rice was a qualified juror. His examination shows that he was prejudiced. The court held that, because the juror "guessed" that he could discard his prejudice and render an impartial verdict upon the law and the evidence, he was competent. The statute declares a juror competent if he has an opinion

State v. McGinnis.

formed from rumor and newspaper report, unless it is such as to bias, and prejudice his mind. In this case Rice declared that he had formed an opinion from what he had read, and that it did bias and prejudice his mind. Revised Statutes 1899, sec. 2616; State v. Foley, 144 Mo. 600. (2) It does not appear what Rice read, whether it was testimony taken by the coroner, or at the preliminary, or the statement of eye witnesses, or rumor. Neither does it make any difference. The statute is levelled against the man who forms an opinion from any kind of a newspaper report; or any kind of a rumor; no matter what, if he is prejudiced by such rumor or report. Its object is to get men free from bias or prejudice, when life or liberty are at stake. State v. Culler, 82 Mo. 623; State v. Foley, *supra.* (3) The court erred in appointing an interpreter for Margaret Borcherding without first determining in some way that the witness could not speak the English language or could not understand it. In this case no investigation was made by the court to determine whether or not the witness could speak English or understand it. State v. Severson, 43 N. W. 533. The defendant asked that this investigation be made. (4) The court erred in permitting the witness Meywald to refer to cattle stealing, and to defendant's breaking into a store. This testimony was very prejudicial to the defendant, and the effect of it was not destroyed by withdrawing the same from the consideration of the jury. State v. Mix, 15 Mo. 153; State v. Marshall, 36 Mo. 400; State v. Fredericks, 85 Mo. 145; State v. Kuehner, 93 Mo. 193; State v. Thomas, 99 Mo. 235. (5) The court erred in giving instruction numbered 2, to the effect that if a homicide was committed by defendant in an attempt to rob deceased, then defendant was guilty of murder in the first degree. The indictment tenders no such issue, it charges a willful, deliberate and premeditated killing by shooting the deceased; it nowhere states that the killing was done in an

attempt to perpetrate a robbery. The instruction was broader than the indictment, and should have been refused. State v. Smith, 119 Mo. 447. Parties must abide by the pleadings. An instruction tendering an issue not pleaded should be refused, although warranted by the evidence. Storm v. White, 23 Mo. App. 31; Matson v. Frazier, 48 Mo. App. 302; Altman & Taylor Co. v. Smith, 52 Mo. App. 351. (6) The court erred in giving instruction numbered 7. This instruction is copied verbatim from one offered in the case of State v. Taylor, 118 Mo. 164. The court in its decision on that case held the instruction erroneous because it was a "comment on the evidence," and "seemingly required the defendant to prove alibi by a preponderance of evidence." This holding is approved in the case of the State v. Harvey, 131 Mo. 347; State v. Tatlow, 136 Mo. 684.

*Edward C. Crow*, Attorney-General, and *Sam B. Jeffries*, Assistant Attorney-General, for the State.

(1) John B. Rice was properly retained on the venire. He had an opinion concerning defendant's guilt or innocence, formed from reading a general account of the affair in a newspaper, but he stated that he had no doubt that he could render a fair and impartial verdict in the case on the evidence and the law. State v. Robinson, 117 Mo. 649; State v. Bryant, 93 Mo. 273; State v. Reed, 137 Mo. 125; State v. Walton, 74 Mo. 270; State v. Stein, 79 Mo. 330; State v. Cunningham, 100 Mo. 382; State v. Williamson, 106 Mo. 162; State v. Duffy, 124 Mo. 1; State v. Brown, 71 Mo. 454; State v. Wilson, 85 Mo. 134. (2) The action of the trial court in permitting witness, Margaret Borcherding, to give her testimony in the German language, and of appointing Paul Bengsch as interpreter, is not a matter for review in this case. The witness was pres-

ent before the trial court and the presumption will be in-dulged that the trial court ascertained that the witness could not be understood in English before he appointed an inter-preter and permitted her to testify in German. The matter of having the testimony of a witness given through an inter-preter has always been one of discretion of the trial court, and is not reviewable on appeal. People v. Ramirez, 56 Cal. 533. (3) The objection is to the words "if proved," in the 7th instruction. Though subject to criticism, the words could not possibly prejudice the defendant in this case, for the reason that the last paragraph of the instruction clearly states that defendant is not required to prove his alibi beyond a reasonable doubt, but merely to "raise a reasonable doubt of his presence at the time and place of the commission of the crime charged." An instruction is not to be read or con-sidered in fragments, but as an entirety. State v. Mathews, 98 Mo. 125; State v. Noeninger, 108 Mo. 166.

GANTT, P. J.—The defendant was indicted for murder in the first degree in the circuit court of Bates county at the June term, 1899. He was duly arraigned and pleaded not guilty. On his trial at the February term, 1900, he was found guilty of murder in the first degree and from the sentence on that verdict he appeals to this court.

The evidence tended to prove the following facts:

About 7:30 o'clock on Sunday evening, April 16, 1899, Frederick Borcherding, a German farmer living on his farm in the southern portion of Bates county, Missouri, went out of his house to look after his stock in the barn lot north of his dwelling. His wife, Margaret Borcherding, was left in the house and one Arthur Collingsworth, a man employed about the premises, was in bed asleep in the upper story of the house. While Borcherding was outside, his wife, as testified to by her upon the witness stand, heard a conversa-

tion between her husband and some other party, at the close of which Mr. Borcherding ran excitedly into the house and slammed the door in the face of the said person who, it seems, was pursuing him. Immediately thereupon a shot was fired from a pistol through the window and Mr. Borcherding fell wounded upon the kitchen floor. This wound resulted in Borcherding's death a few days later.

After the shot was fired a man came into the house and demanded money of Mrs. Borcherding. It was dark in the house at this time, the light having gone out at the time the pistol shot was fired. The robber laid his hand upon Mrs. Borcherding as if to silence her (for she was screaming), and, showing her a pistol, commanded her to be quiet. He turned her loose, however, and went into a room behind the kitchen. Mrs. Borcherding then lighted the lamp, which had gone out at the time the pistol shot was fired, and the hired man, who had been awakened by the shot of the pistol, the screams of Mrs. Borcherding and the cries of her wounded husband, came downstairs into the kitchen and, at the command of Mr. Borcherding, went into another room for a gun. The robber then entered the kitchen and looked at Mr. Borcherding as he lay wounded upon the floor, and taking hold of Mrs. Borcherding, took her out of the house into the yard where, as Mrs. Borcherding testified, he made repeated demands upon her for money. The hired man, stepping back into the kitchen, saw through the open doors the forms of Mrs. Borcherding and the robber on the outside, but could not distinguish the face of either and, upon the trial, was able to give no other description of the robber than that he wore a long coat.

Failing in his attempt to get money, the robber soon left the premises, going out into the road in front of the place. It was a moonlight night and Mrs. Borcherding testifies that the robber wore a rubber coat, lined inside, a large slouch hat

of grayish color, and had his trousers in his boots.   She further stated that while she was with him on the outside of the house he rolled together something in paper and lighted it.   Other witnesses testified that defendant was a cigarette smoker.

A few days later the defendant was arrested and brought to Mrs. Borcherding's house for identification and upon the trial she testified that he was the same man who had committed the crime.   At the time of his arrest, defendant had on his person a thirty-eight calibre Colts revolver, sixty-five dollars in money and a ticket to Nevada, Missouri.   He was taken to the house of Borcherding and was identified by Mrs. Borcherding as the robber who shot her husband.

C. Kugler testified that just after the shooting he came to Mr. Borcherding's house from a northwesterly direction and that as he reached the gate he heard the sound of the beating of horse's hoofs along the road west of the place; that from the sound the horse must have been going very fast.

Something like a dozen witnesses testified that on the evening of the day on which the murder was committed, at about four or five o'clock, they saw three men riding along the road in the direction of Mr. Borcherding's house.   These men were one B. Merchant and one Ed. Abel, who rode in a wagon, and the defendant, who rode a horse either along by the side of the wagon or behind it.   The defendant wore a slouch hat of light color and had a bundle, apparently a coat, strapped behind his saddle.   Some of the witnesses testified that his horse was gray, and others that it was white, but all agree that it was of light color.   At the turn in the road, B. Merchant seems to have parted from Abel and the defendant, as indeed he testified that he did, for the witnesses who testified to seeing defendant at those points along the road nearest to Borcherding's house say that they saw Abel

and the defendant riding together on gray horses along the road in the direction of Borcherding's house, and made no mention of Merchant.   Those witnesses who saw Merchant, Abel and the defendant together, testified to a gray horse being led behind the wagon in addition to the horse which defendant rode.

Robert Davis, who lived about half a mile from Borcherding's house and on an adjoining farm, on the Sunday evening of the murder, from his house saw a man mounted on a gray horse enter the field of his neighbor, Mr. Fuchs, and ride along the side of the orchard upon a private road of Mr. Fuchs in the direction of his house.   This was about six o'clock, and after seven o'clock that evening the witness heard a gun shot and scream in the neighborhood, but could not locate the sound definitely, although he said that it seemed to come from the direction of Mr. Borcherding's.

The members of the family of Mr. Fuchs testified that Ed. Abel came to their house by the road just described before the sun was down and did not leave the place until the following morning.

Peter Schilt testified that he was at the house of Mr. Fuchs that evening and that Ed. Abel came to the place by the private road running along the side of the orchard at about half past five and that no one was with him..

On the morning following the murder the defendant was seen at Stumptown by different witnesses, where he had gone to sell his white pony to one Dr. Lusk.   One Mrs. Callahan, who saw him there, testified that there was a large roll behind his saddle.   Defendant wore boots, light coat, dark pants and high crowned hat, and carried in his belt a pistol, which was of a dull blue color.

The boots, hat and other clothes which the defendant wore and the revolver which he carried when he was arrested were in evidence before the jury.

Dr. E. J. Veidt was the physician who dressed the wound of Borcherding and took the bullet from his body. He testified that the bullet had been somewhat flattened by passing through the window pane and through the backbone of Mr. Borcherding's body, but that the bullet was of the same kind as the one which was taken from the defendant's pistol after he was arrested. There was further evidence that bullets of this size were made especially to fit pistols of the kind which the defendant had.

Witness Lester Phillips testified that upon the request of the prosecuting attorney he concealed himself in the jail after the defendant's arrest and overheard a conversation between the defendant and Ed. Abel in which the defendant asked Abel not to tell that they had come along a certain road, but to say that they had gone along a certain road in another direction, and that later in the conversation the defendant said to Abel, "For God's sake, don't say anything about a mackintosh or a pair of spurs. Outside of that old mackintosh the old lady never would have identified me."

Witnesses Mudd and Leech testified that the defendant stated when he was arrested that on the evening of the murder he had gone from Rich Hill northwest across the Marias Des Cygnes and thence northwest to his brother William's.

The evidence introduced on the part of the defendant was for the purpose of establishing an alibi.

B. Merchant testified that about two o'clock in the afternoon, or a little after, on the day of the murder, he started from Rich Hill with his wagon and team to go to a place where he had been engaged to work, about two miles east of Papinsville; that he met Ed. Abel on the road and they journeyed together. After going about two miles the defendant overtook them and rode with them. The defendant rode in his shirt sleeves and had a bundle tied on behind

his saddle, which he supposed to be defendant's coat. It was a warm day and witness also rode with his coat off. Abel's horse was tied behind the wagon. Will McGinnis, the brother of defendant, rode along the road behind them. About a quarter of a mile east of the bridge they parted, the witness going south to his place near Papinsville and Abel and the defendant turning to the north. The witness testified that Abel and the defendant were step-brothers by marriage; that Abel was a nephew to the witness and that the defendant was his brother-in-law by marriage.

William McGinnis, defendant's brother, testified that he left Rich Hill that Sunday afternoon about three o'clock; that he saw defendant in company with Merchant and Abel riding along the road and that at one time he came up very close behind them. Defendant was in his shirt sleeves and his coat was strapped behind his saddle. This coat, the witness testified, was of a light stripe and was not a mackintosh. He testified that the defendant came to his house about seven o'clock that evening and spent the night.

J. L. Carver and his wife each testified to seeing the defendant on the road in front of their place going toward the house of William McGinnis, a brother of defendant, between sundown and dark. They said that he wore a light hat and coat and was riding a white horse.

D. W. Short testified that between sunset and dark he saw the defendant pass along the road in front of his place going west. The testimony of these witnesses, Mr. and Mrs. Carver and Short, if credited, would establish the fact that defendant could not have been present at the house of Mr. Borcherding at the time he was murdered.

The State introduced a number of witnesses who testified that the reputation of Carver and Short for truth and veracity in their community was bad; the defendant, on the other hand, produced witnesses who testified that their reputation was good.

A. Requa, on rebuttal for the State, testified that he was at the house of Wm. McGinnis for a while on the Sunday evening of the murder and left after sundown, and that the defendant was not there at that time.

J. E. Requa was introduced by the State in rebuttal and testified that he had a conversation with William McGinnis relative to the killing of Borcherding, in which McGinnis said that he did not know just when his brother, the defendant, came in on the Sunday night of the killing, but that it was before he went to sleep.

John Fuchs testified for the defendant that he was at the Borcherding house on the evening that the defendant was brought there by the sheriff to be identified by Mrs. Borcherding, and that when the defendant was shown to Mrs. Borcherding she said: "I can't tell for certain whether you are the boy or not," and then she shook her head and said, "Bring on the other boy." He is contradicted on this point, however, by other witnesses who were present at the time and who testified that Mrs. Borcherding positively identified the defendant at the time as the one who murdered her husband.

The defendant, testifying in his own behalf, swore that his conversation with Abel in the jail was not as testified to by Lester Phillips, but that he asked Ed. Abel if he had told Hardy where they separated on the road, and that Abel replied that he had told Hardy that they separated at Shepler's corner, to which the defendant said that he told Abel that he talked too much. He further said that in that conversation he asked Abel if he had said anything about his having talked of going down to old man Merchant's and that Abel said that he had told Hardy that he was talking of going down there. Defendant said also that in that conversation he told Abel about different clothes having been put on him at the Borcherding house when he was taken there to be

identified and that he said that when they put a little black mackintosh on him, the old lady shook her head and said she was not sure; for them to bring on another man and she would pick out the right one. The defendant testified that on the night of the murder he was at his brother Will's, that to the best of his recollection he reached there about seven o'clock in the evening, it being after sundown.

The defense offered to show that while the defendant was in jail awaiting the trial, he had an opportunity to escape, but did not try to get away; but the evidence was excluded by the court.

The indictment is in these words:

"The grand jurors for the State of Missouri, summoned from the body of the county of Bates, duly impaneled, charged and sworn to inquire within and for the body of the county of Bates and State of Missouri, upon their oath present that one Noah McGinnis, late of the county of Bates and State of Missouri, on the 16th day of April, 1899, at the county of Bates and State of Missouri, in and upon one Frederick W. Borcherding, then and there being, feloniously, wilfully, deliberately, premeditatedly, on purpose and of his malice aforethought did make an assault, and with a certain deadly and dangerous weapon, to-wit, a pistol, commonly called a revolver, then and there loaded with gunpowder and leaden balls, and which said pistol, he, the said Noah McGinnis, then and there had and held in his right hand, at and against the body of him the said Frederick W. Borcherding, then and there feloniously, wilfully, deliberately, premeditatedly, on purpose and of his malice aforethought did shoot off and discharge, and with the said pistol aforesaid and the gunpowder and leaden balls aforesaid, then and there feloniously, wilfully, deliberately, premeditatedly, on purpose and of his malice aforethought did shoot, strike and penetrate him, the said Frederick W. Borcherding, in

and upon the middle of the back of him, the said Frederick W. Borcherding, then and there with the said pistol aforesaid, and the gunpowder and leaden balls aforesaid, so shot off and discharged at and against the body of him, the said Frederick W. Borcherding, as aforesaid, feloniously, wilfully, deliberately, premediatedly, on purpose and of his malice aforethought, giving to him, the said Frederick W. Borcherding, in and upon the middle of the back of him, the said Frederick W. Borcherding, one mortal wound of the depth of nine inches, and of the breadth of three-fifths of an inch, of which said mortal wound, so given as aforesaid, the said Frederick W. Borcherding, from the said 16th day of April, 1899, until the 19th day of April, 1899, at the county of Bates and State of Missouri, did languish, and languishing did live, on which said 19th day of April, 1899, at the county of Bates and State of Missouri, of the said mortal wound, so given as aforesaid, he, the said Frederick W. Borcherding, did die. And so the grand jurors aforesaid, upon their oath aforesaid, do say, that the said Noah McGinnis, him, the said Frederick W. Borcherding, at the time and place aforesaid, in the manner and form aforesaid and by the means aforesaid, feloniously, wilfully, deliberately, premediatedly, on purpose and of his malice aforethought did kill and murder, against the peace and dignity of the State."

Such of the instructions as are criticised will be noticed in the course of the opinion.

The several assignments of error will be considered in the order of defendant's brief.

I. It is insisted that John B. Rice was not a qualified juror. This juror on his *voir dire* examination stated that he had not talked with any witness in the case and knew nothing about it save what he had read in the newspaper reports. It did not appear that the evidence taken on the coroner's inquest or the preliminary examination had been

published. Indeed, the juror said he had merely read a general report of the homicide, and his opinion was based on that alone, and notwithstanding his opinion thus formed he could give the prisoner a fair and impartial trial and render a verdict upon the testimony alone under the instructions of the court. He said that he retained the opinion he had formed and it might prejudice or bias his mind, but he had no doubt that he could render a fair and impartial verdict. To this juror the defendant objected generally without specifying any ground of incompetency.

It was ruled by this court in State v. Taylor, 134 Mo. loc. cit. 142, that, "Nothing is better settled than that challenges for cause must be *specifically* stated. The particular cause must be set forth." That decision was followed in State v. Reed, 137 Mo. loc. cit. 132, wherein it was said, "It is well settled in this State that a person otherwise qualified to sit as a juror in a criminal case, is not disqualified by reason of having formed an opinion as to the guilt or innocence of the accused from reading partial newspaper accounts of the homicide, or from rumor, when he states on his *voir dire* that he can give the defendant a fair and impartial trial," and, "Moreover, a general objection did really not amount to an objection."

We are cited to State v. Foley, 144 Mo. 600; as sustaining the contention here made, but a reading of that case will show that the jurors were held incompetent because they had heard the first trial of the defendant and had talked with the witnesses and had formed their opinions from the evidence and conversation with witnesses. To that ruling, also, we still adhere, but the case is wholly different from the proposition here made. We hold the objection was insufficient to authorize a review in this court.

II. The circuit court, on the suggestion of the prosecuting attorney, appointed an interpreter to interpret Mrs. Borcherding's evidence, and this is urged as error.

By statute (sec. 1600, R. S. 1899) the courts of this State are authorized to appoint interpreters and translators to interpret the testimony of witnesses.   In the very nature of things, the courts are invested with a discretion in appoint- ing interpreters and unless it shall appear that there has been an abuse of this power, it affords no ground for reversal by this court.   This lady was present in court.   The judge had an opportunity of observing her and no showing whatever was made by defendant's counsel that Mrs. Borcherding could speak English or understood it well enough to undergo an examination in English.   No effort was made even in the cross-examination to learn from her to what extent she under- stood or could speak the English language.   We find nothing which would authorize us to say the court exercised its discre- tion unwisely and the point must be ruled against defendant.

III.   The third proposition advanced by counsel for defendant is but an amplification of the second.   It must be decided in the same way.   It does not at all follow that because the witness had picked up some words and sentences in English, she was competent to carry on a conversation of any length, much less undergo an examination and cross- examination in English.

IV.   A much more serious question is raised by the learned counsel as to the testimony of Meywall.   This wit- ness was a policeman of Rich Hill and testified he was at the county jail and overheard a conversation between the prose- cuting attorney and defendant.   He was asked to give the substance of that conversation and the language as nearly as he could recollect it.   He began by saying that the prose- cuting attorney said to defendant he wanted him for cattle- stealing.   Immediately counsel for the defendant objected and the court stopped the witness and told him to eliminate everything that was said by the parties about cattle-stealing, and confine himself to what was said about the killing of Mr. Borcherding.

It is hard to see how the court could have excluded all reference to the charge of cattle-stealing, which the witness had volunteered. It not only promptly ruled it out, as was its duty, but it expressly instructed the jury that they must not give any weight to evidence which the court had excluded.

Defendant also complains that this same witness when asked if he had seen the defendant with a pistol prior to the killing of Borcherding and what sort of a pistol it was, did not confine himself to stating that he had seen defendant with a pistol ten or twelve days before the killing of Borcherding and that it was a dark colored pistol, but went on to say defendant had robbed a store on the occasion and when he, the policeman, came up, defendant shot at him with the pistol. The answer was not responsive to the question of the prosecuting attorney and the court on motion of defendant at once struck out everything but the evidence that witness had seen the pistol and his description of the man who had it. The evidence thus excluded was also covered by the court's instruction to disregard the excluded evidence.

Counsel now urge that notwithstanding the court struck out the voluntary statement made by the witness still its effect remained to prejudice the jury against him.

We are cited to decisions of this court to the effect that an instruction to disregard evidence *improperly admitted* will not cure the error. [State v. Fredericks, 85 Mo. loc. cit. 150; State v. Thomas, 99 Mo. 235; State v. Hopper, 71 Mo. 425.] But in this case this objectionable evidence never received the approval of the court. It was not sought by the State. The question did not call for it and the court at once struck it out and by way of emphasizing its disapproval expressly instructed the jury to disregard it. It did not then go to the jury with the sanction of the court.

In State v. Fredericks, *supra*, it was said by HENRY, C. J., for the court: "If the objectionable evidence had

been given by the witness inadvertently, because of its intimate connection with the admissible portion, or perversely, we should not be inclined to reverse the judgment when, by an instruction, the court had done all in its power to destroy the effect of such evidence upon the minds of the jury." The facts of this case bring it within the doctrine then announced, and we are unwilling to reverse the case because the witness alluded to matters not in issue, and the court not only excluded the incompetent evidence at once but afterwards directed the jury not to consider it. Any other rule, it seems to us, would put it in the power of an ignorant or perverse witness to thwart the efforts of the court and counsel to try cases according to law and hold them responsible for conduct which they have rebuked.

V. The second instruction given by the court was in these words:

"The jury are further instructed that if you find and believe from the evidence in this cause beyond a reasonable doubt that the defendant, Noah McGinnis, at the county of Bates and State of Missouri, on or about the 16th day of April, 1899, wilfully, deliberately, premeditatedly and with malice aforethought shot and wounded one Frederick W. Borcherding in the perpetration of or attempting to perpetrate a robbery upon him, the said Frederick W. Borcherding, and if you further find from the evidence that within a year and a day thereafter and during the month of April, 1899, the said Frederick W. Borcherding died from the effects of such wounding inflicted by the defendant as aforesaid at the county of Bates and State of Missouri, as charged in the indictment, you will find the defendant guilty of murder in the first degree, and unless you so find beyond a reasonable doubt, you will acquit the defendant. The term robbery as mentioned in these instructions means the felonious taking of the money or property of another from his person or in his

presence and against his will either by violence to his person or by putting him in fear of some immediate injury to his person, with the intent to permanently deprive the owner of such money or property and without any honest claim to it. An attempt to perpetrate a robbery means the wilful doing of an act or acts towards the commission of a robbery for that purpose and with that intent, but a failure in the perpetration thereof."

It is objected that this instruction is erroneous because the indictment tendered no such issue, as it simply charged a wilful, deliberate and premeditated killing by shooting, and nowhere alleged that it was done in an attempt to perpetrate a robbery. The instruction was entirely correct as we have repeatedly ruled. [State v. Schmidt, 136 Mo. loc. cit. 651; State v. Foster, 136 Mo. loc. cit. 655; State v. Hopkirk, 84 Mo. 278; State v. Meyers, 99 Mo. 107; State v. Donnelly, 130 Mo. 642.]

VI. The seventh instruction is as follows:

"When a person on trial for a crime shows that he was in another place at the time when the act was committed, he is said to prove an alibi. One of the defenses interposed by the defendant in this case is what is known as an "alibi," that is, that the defendant was in another place at the time of the commission of the crime. The court instructs the jury that such defense is as proper and legitimate, if proved, as any other, and all evidence bearing on that point should be carefully considered by the jury. If, in view of all the evidence, the jury have a reasonable doubt as to whether defendant was in some other place when the crime was committed, they should give him the benefit of the doubt, and acquit him. As regards the defense of an alibi, the jury are instructed that the defendant is not required to prove that defense beyond a reasonable doubt to entitle him to an acquittal. It is sufficient if the defense upon that point

raises a reasonable doubt of his presence at the time and place of the commission of the crime charged."

It is challenged because the court used the phrase, "if proved." The language is most unfortunate and was criticised by this court in State v. Taylor, 118 Mo. loc. cit. 178, but when taken altogether we think it clearly informed the jury that if in view of all the evidence the jury had a reasonable doubt of the presence of the defendant at the time and place of the commission of the crime they should acquit him, and that it was sufficient if the defense raised a reasonable doubt of his presence at the time and place of the homicide to acquit him.

The judgment in State v. Taylor, 118 Mo. 178, was not reversed because the court gave this instruction. This instruction was asked by the defendant in that case and refused and we took occasion then to point out that it seemingly exacted too much of defendant, but held that it incorporated the true doctrine in its last clause which requires the jury to acquit if they have a reasonable doubt upon all the evidence that the defendant was present at the time and place of the commission of the alleged crime or if the evidence of the defendant to support his defense of *alibi* raises a reasonable doubt of his presence at the time and place of the commission of the alleged crime.

Evidently, the criticism of the instruction has been overlooked and in future its seeming inconsistencies should be avoided. The words "if proved," have no place in the instruction, neither should the jury be told that defendant is not required to prove his alibi beyond a reasonable doubt. No State requires that. The jury should simply be told that the defense of alibi, that is to say, that the defendant was at another place at the time of the commission of the crime, is a legitimate one, and if the defendant's evidence is sufficient to raise a reasonable doubt of his presence at the time

and place of the commission of the crime, or, if by reason of the insufficiency of the State's evidence, the jury have a reasonable doubt of the defendant's presence at the time and place of the commission of the crime, or, if taking all the evidence together they have a reasonable doubt of his presence at the commission of the crime, they should acquit him. [State v. Harvey, 131 Mo. loc. cit. 346; State v. Taylor, 134 Mo. loc. cit. 152.]

VII.    Another ground of complaint is that the court failed to give a cautionary instruction to the jury with regard to the verbal admissions and statements of the defendant.    No such instruction was asked and no exception taken to the failure of the court to instruct upon all questions of law arising in the case and hence, that failure is not before us for review.

VIII.    The last assignment is that the verdict is the result of passion or prejudice.    The testimony, if believed by the jury, was sufficient to support the verdict.    It was the province of the jury, who saw and heard the witnesses, to pass upon the credibility of the witnesses and their verdict has received the approval of the trial court. Under these circumstances, we have no right to interfere with the verdict.

The judgment is affirmed and the sentence of the law directed to be executed.    *Sherwood* and *Burgess, JJ.*, concur.